Filed 3/9/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NCR PROPERTIES, LLC,<br><br>      Plaintiff and Appellant;<br><br>v.<br><br>CITY OF BERKELEY et al.,<br><br>      Defendants and Respondents;<br><br>SYDNEY LEE et al.,<br><br>      Real Parties in Interest. | A163003<br><br>(Alameda County<br>Super. Ct. No. RG19024268) |
| 2504 DANA STREET, LLC,<br><br>      Plaintiff and Appellant;<br><br>v.<br><br>CITY OF BERKELEY et al.,<br><br>      Defendants and Respondents;<br><br>GLORIA CHEN et al.,<br><br>      Real Parties in Interest. | (Alameda County<br>Super. Ct. No. RG19028640) |

Appellant landlords (Landlords) purchased two derelict single-family homes in Berkeley and rehabilitated them, converting them into triplexes. After Landlords rented out the units, a dispute arose as to whether the properties are subject to the City of Berkeley's Rent Stabilization and Eviction for Good Cause Ordinance, Berkeley Municipal Code Chapter 13.76 (Rent Ordinance). Landlords contended the new units are exempt from local

rent control under the Costa-Hawkins Rental Housing Act, Civil Code section 1954.50 et seq. (Costa-Hawkins), which provides an exemption for residential units that have a certificate of occupancy issued after February 1, 1995.  (Civ. Code, § 1945.52, subd. (a)(1).)

The City of Berkeley's Rent Stabilization Board (Rent Board) disagreed as to four of the six units.  Explaining that, before Landlords purchased the homes, the properties had been managed as rooming houses, the Rent Board concluded two of the three units in each building were carved from space that had been rented for residential use before the current certificates of occupancy issued.  Thus, these four units reflect a mere conversion from one form of residential use to another, rather than an expansion of the housing stock.  Only an attic unit in one building and a basement unit in the other are exempt from local rent control as new construction, the Rent Board found.  Informing the Rent Board's conclusion was its Resolution 17-13 (Resolution 17-13), an interpretive gloss on the Rent Ordinance.[1]

---

[1] We grant respondents' unopposed request for judicial notice of the following documents:  a certified copy of Resolution 17-13, copies of Rent Board Regulations 403 & 403.5, and excerpts of Berkeley Municipal Code (B.M.C.) section 13.76.010 et seq.  (See Evid. Code, §§ 452, subds. (b) & (c), 453, 459.)  We likewise grant appellants' unopposed request for judicial notice of the City of Berkeley's "Guidelines for Issuance of Certificates of Occupancy," available at <https://berkeleyca.gov/sites/default/files/2022-02/Guideline%20for%20Issuance%20of%20Certificates%20of%20Occupancy%20Policy.pdf> (as of Mar. 9, 2023).  We deny as unnecessary appellants' request for judicial notice of the Legislative Counsel's Digest for Assembly Bill No. 1164 (1995–1996 Reg. Sess.), which became Costa-Hawkins, and Appellants' Request for Judicial Notice in Support of Letter Brief because published legislative history may be cited without a request for judicial notice.  (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 46, fn. 9.)  And we deny the remaining requests for judicial notice on relevance grounds.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 ["a precondition to the taking of judicial notice in

2

We reach the same conclusion by applying the rule of *Burien, LLC v. Wiley* (2014) 230 Cal.App.4th 1039 (*Burien*) to the admittedly new context of this case. Because the four units in dispute were converted from space long dedicated to residential use, *Burien* teaches that Costa-Hawkins does not exempt them from local rent control as new construction. And because Resolution 17-13 interprets the Rent Ordinance in a manner consistent with *Burien* and with Costa-Hawkins, neither Resolution 17-13 nor the Rent Ordinance is preempted by state law.

## BACKGROUND

Landlords are two corporate entities formed by the same persons to engage in parallel projects, that is, to purchase, upgrade, and rent out residential property in Berkeley. Appellant 2504 DANA STREET, LLC purchased a single-family home at that address (Dana Street) in 2012. Appellant NCR PROPERTIES, LLC purchased a similar home at 2401 Warring Street (Warring Street) the following year. In light of the overlap in membership and activity between appellants, we refer to them both individually and collectively as "Landlords."

Before Landlords purchased Dana Street, the property was operated as an unpermitted rooming house.[2] A three-story building with a steeply pitched roof, it was originally a single-family home that had been permitted in the 1970's as a foster home for girls. As of 2006, 11 rooms in the 14-

---

either its mandatory or permissive form" is that "any matter to be judicially noticed must be relevant to a material issue"].)

[2] A rooming house is a building, other than a hotel, rented to at least five individuals with at least five separate leases, according to Rent Board regulations. (Rent Board Regs. 403, 403.5.) The City apparently requires a use permit to convert a single-family home to a rooming house, but even where no permit has been obtained, a property operating as a rooming house must be registered with the Rent Board. (Rent Board Reg. 403.5, subd. (B).)

bedroom, 4.5-bath home housed individual renters, but these rooms were not subject to rent control because the owner also resided in the home and shared kitchen and bath facilities with the tenants. Also, the home had deteriorated to the point where it could not be legally inhabited, in part because inadequate egress and a faulty sprinkler system rendered the third floor a fire hazard. The building was sold to Landlords with the understanding that its remaining tenants would move out before closing.

In August 2012, Landlords applied for a permit to convert Dana Street to a triplex. Among other improvements, they would raise the walls and substantially reduce the pitch of the roof to expand the second- and third-floor living spaces, replace the building's foundation, build external staircases and separate entrances to the second- and third-floor apartments, and install a new kitchen in each unit. When the project was finished, the building had 9 bathrooms, 19 bedrooms, and a total of more than 5,500 square feet of living space, of which 1,245 square feet was new. In December 2014, the City of Berkeley (City) issued Landlords a certificate of occupancy, reflecting a change in occupancy classification from single-family dwelling to multi-family use. Tenants moved in.

Before Landlords purchased the building on Warring Street it, too, had operated as an unpermitted rooming house for decades. Although classified for occupancy as a single-family residence, the three-story home had been registered with the Rent Board as an 11-unit rooming house since 2000. When Landlords took possession in 2013 only one tenant remained, and he soon moved out. The building was in poor condition, with a history of building code violations.

Landlords applied for a use permit to create a new basement unit and to convert the three floors that had been a rooming house on Warring Street

4

into two apartments.  The project involved replacing the building's foundation, excavating space in the basement to create 1,254 square feet of newly habitable living area, adding 95 square feet of habitable space and a roof deck to the third story, installing a new kitchen in each unit, and other upgrades.  The City Council approved the project in January 2015, the work was then done, and in December 2015 Landlords received a certificate of occupancy for their new triplex.

Originally, the City took the position that all six of the new units in Landlords' buildings were exempt from rent control under Costa-Hawkins as new construction.  The City Manager so stated with regard to Warring Street in January 2015, when she recommended to the City Council that it approve Landlords' application to convert the property to a triplex.  A lower-level employee reached the same conclusion with regard to Dana Street in a May 2015 email.  Both times, it was the new certificate of occupancy that caused the City to conclude all the new rental units were exempt from the Rent Ordinance.  Then, in November 2016, Berkeley voters passed Measure AA, which amended the Rent Ordinance's provision on new construction.  (See B.M.C. 13.76.050.I.)

In May 2017, the Rent Board reversed course on these two properties.  It sent Landlords letters declaring that two of the three units on Warring Street and all three units on Dana Street were subject to the Rent Ordinance.  The letters constituted an administrative determination that the space that became these five units had been previously put to residential use, so that the 2014 decision in *Burien, supra,* 230 Cal.App.4th 1039 rendered these units not exempt from local rent control under Costa-Hawkins.  Only the basement unit on Warring Street, where Landlords had excavated previously

5

uninhabitable space, was beyond the reach of the Rent Ordinance, according to the administrative determination.

A month later, the Rent Board enacted Resolution 17-13, which provides: "A rental unit with a certificate of occupancy issued after residential use of the unit began shall not qualify as exempt" from rent control under the " 'new construction' " exemption in the Rent Ordinance. The stated purpose of this resolution was to "ensure that Berkeley's local new construction exemption does not conflict with the holding in *Burien*," and thus with Costa-Hawkins.

Landlords contested the Rent Board's administrative determination, filing petitions on January 19, 2018, to determine the exempt status of the units. A hearing officer for the Rent Board denied the petitions in December 2018, relying on Resolution 17-13 and *Burien*. Landlords appealed, and the Rent Board then modified the hearing officer's decision with respect to Dana Street, to reflect that the third-story unit there was exempt from the Rent Ordinance because Landlords had created much of that habitable space by raising the roof. The Rent Board affirmed the hearing officer's decisions in all other respects.

In June 2019, Landlords timely filed petitions in the trial court challenging the Rent Board's decisions. Named as respondents were the City and the Rent Board. Each petition asserts a cause of action for administrative mandamus (citing Code Civ. Proc., §§ 1094.5, 1085), alleging that "the Rent Board exceeded its jurisdiction, and/or abused its discretion," including by misapplying *Burien* and Resolution 17-13 and by making regulatory findings inconsistent with Costa-Hawkins' exemption for new construction. Each petition also asserts a cause of action for declaratory

relief as to related legal contentions (see Code Civ. Proc., § 1060), including a declaration that state law preempts Resolution 17-13.

The petitions were consolidated and, on May 6, 2021, denied. The trial court found that Resolution 17-13 and the Rent Board's decisions regarding the Dana Street and Warring Street triplexes "accurately reflect the *Burien* holding." Judgment was entered in favor of the City and the Rent Board, and this timely appeal ensued.

## DISCUSSION

This appeal presents two questions of law: whether the Rent Board correctly construed and applied Costa-Hawkins in determining that the four challenged units are not exempt from local rent control and, relatedly, whether Costa-Hawkins preempts Resolution 17-13's construction of Berkeley's Rent Ordinance. The material facts are not in dispute, and we independently review questions of law. (See *Palmer/Sixth Street Properties, L.P. v. City of Los Angeles* (2009) 175 Cal.App.4th 1396, 1405 [mandamus claim involving Costa-Hawkins]; *Crocker National Bank v. City & County of San Francisco* (1989) 49 Cal.3d 881, 888 [mixed questions of law and fact that are "predominantly legal"].) We first review the legal backdrop before considering the two issues in turn.

### I.

The Legislature enacted Costa-Hawkins in 1995 to moderate what it considered the excesses of local rent control. (See *Mosser Companies v. San Francisco Rent Stabilization & Arbitration Bd.* (2015) 233 Cal.App.4th 505, 514.) The act has two main sections. One section, not at issue in this case, prohibits vacancy control. With few exceptions, it gives California landlords the right to set the rent on a vacant unit at whatever price they choose. (Civ. Code, § 1954.53.) The provision at issue here goes further, where it applies.

7

Civil Code section 1954.52, subdivision (a) ("section 1954.52(a)") exempts three categories of rental property from rent control, even for existing tenancies.

Section 1954.52(a) states, "Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit about which any of the following is true: [¶] (1) It has a certificate of occupancy issued after February 1, 1995. [¶] (2) It has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units. [¶] (3)(A) It is alienable separate from the title to any other dwelling unit . . . ." This third exemption is complex, but for present purposes it suffices to observe that the third exemption generally includes single-family homes and condominiums, which are both separately alienable property interests. (See *Burien*, *supra*, 230 Cal.App.4th at p. 1045.)

As originally enacted, the statute contained a loophole, which the Legislature closed in 2001. (*Burien*, *supra*, 230 Cal.App.4th at pp. 1046–1047.) In pertinent part, the Legislature amended the third exemption in section 1954.52(a) to exclude " '[a] condominium dwelling or unit that has not been sold separately by the subdivider to a bona fide purchaser for value.' " (*Id*. at p. 1045, quoting § 1954.52(a)(3)(B)(ii).) The problem the Legislature was seeking to solve is illustrated by the facts of *Burien*. There, a tenant leased an apartment in 1981 and, still resident there 30 years later, received a notice that his rent would suddenly more than double. (*Burien*, at pp. 1042–1043.) The landlord had recently converted the building to condominiums and, without selling the tenant's unit, sought to increase the tenant's rent by an amount well in excess of what the local rent control

8

ordinance would tolerate. (*Id*. at p. 1043.) Under Costa-Hawkins as originally passed, the tenant's unit would have been exempt from local rent control because the condominium was separately "alienable," even though still owned by the same landlord. (§ 1954.52(a)(3)(A).) After amendment in 2001, the third exemption in section 1954.52(a) no longer applied to the tenant's condominium because the landlord subdivider had not sold the unit.

With one loophole closed, the *Burien* landlord looked for another. Instead of invoking the third exemption in section 1954.52(a), it invoked the first exemption, for properties with "a certificate of occupancy issued after February 1, 1995." (§ 1954.52(a)(1).) When the landlord converted its building to condominiums, it "obtained a new certificate of occupancy . . . based on the change of use from apartments to condominiums." (*Burien*, *supra*, 230 Cal.App.4th at p. 1043.) This occurred after 1995, so the landlord contended the plain language of the first exemption removed the tenant's condominium from the reach of local rent control. (*Id*. at p. 1047.) The tenant read the first exemption differently. He contended "the exemption refers to the first certificate of occupancy issued for the unit," and did not apply to his unit because his tenancy pre-dated the new certificate. (*Id*. at p. 1044.) The *Burien* court concluded, "the language of subdivision (a)(1), standing alone, is susceptible of both parties' constructions, but reading the section as a whole, the exemption can only apply to certificates of occupancy that precede residential use of the unit." (*Ibid*.) *Burien* broadly announced a rule, consistent with but not apparent from the plain language of the statute, that "section 1954.52, subdivision (a)(1), refers to certificates of occupancy issued prior to residential use of the unit." (*Id*. at p. 1042.)

In explaining its reasoning, the court first reviewed familiar principles of statutory construction. "Our primary task is to determine the intent of the

legislative body, so as to construe the statute to effectuate that purpose. [Citation.] We begin with the words of the statute. . . . 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature. . . .' [¶] But the court is not prohibited 'from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. . . . Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.' " (*Burien*, *supra*, 230 Cal.App.4th at p. 1043.) Where statutory language is " 'reasonably susceptible to more than one interpretation, we will "examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. . . ." ' " (*Id*. at p. 1044.) And " ' "[w]e must select the construction that comports most closely with the apparent intent of the Legislature." ' " (*Ibid*.)

The *Burien* court next reviewed the 2001 amendment to Costa-Hawkins and its legislative history. The court cited an analysis of Senate Bill No. 985 (2001–2002 Reg. Sess.) by the Assembly Committee on the Judiciary, describing the 2001 amendment as necessary because section 1954.52, subdivision (a)(3) " 'was originally created to spur construction of condominiums' " but was being used instead to convert existing apartments to condominiums. Closing this " 'loophole,' " the 2001 amendment would ensure that " 'apartment units that have remained rentals would be subject to local rent control laws.' " (*Burien*, *supra*, 230 Cal.App.4th at pp. 1046–1047.)

The court assessed the parties' proffered interpretations of section 1954.52(a)(1) against what the court took to be the purpose of the exemption.

(*Burien*, *supra*, 230 Cal.App.4th at pp. 1047–1048.)  The court explained, "[w]hen a building is constructed, added on to, or altered, a certificate of occupancy is generated at the conclusion of all inspections to certify that the building meets local building code requirements for occupancy.  A commonsense interpretation of section 1954.52, subdivision (a)(1), is that it excludes buildings from rent control that are certified for occupancy after February 1, 1995.  Buildings that were certified for occupancy prior to February 1, 1995, are not excluded." (*Id*. at p. 1047.)  This interpretation, proffered by the tenant, "furthers the purpose of the exemption by encouraging construction and conversion of buildings which add to the residential housing supply," while otherwise leaving in place protection for tenants. (*Ibid*.)  By contrast, the court found, the landlord's construction "does not further the purpose of the statute.  A certificate of occupancy based solely on a change in use from one type of residential housing to another does not enlarge the supply of housing." (*Ibid*.)

The *Burien* court also observed that the landlord's construction of section 1954.52, subdivision (a)(1), would negate the 2001 amendment of subdivision (a)(3), rendering that portion of the statute "nugatory." (*Burien*, *supra*, 230 Cal.App.4th at p. 1047.)  If a certificate of occupancy issued as part of a condominium conversion could exempt a unit from rent control under subdivision (a)(1), as the landlord in *Burien* contended, then there would be no need to assess whether, under subdivision (a)(3), a tenant's unit had "been sold separately by the subdivider to a bona fide purchaser." (§ 1954.52(a)(3)(B)(ii).)  The court concluded, "[i]nterpreting section 1954.52, subdivision (a)(1) to apply to any certificate of occupancy issued after 1995 would circumvent the tenant protection enacted by the Legislature under

11

subdivision (a)(3) for buildings converted to condominiums." (*Burien*, at p. 1048.)

Finally, the *Burien* court considered parallel exemptions in local rent-control ordinances designed to encourage the creation of new residential housing, which led to a discussion of *Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24 (*Da Vinci Group*). (*Burien, supra*, 230 Cal.App.4th at pp. 1048–1049.) While *Da Vinci Group* is consistent with *Burien*, it predates Costa-Hawkins and construes an ordinance not at issue in this case, and the case is accordingly of limited use here.

But *Burien*'s discussion of *Da Vinci Group* does show that the *Burien* court was thinking about other conversions, beyond the paperwork condominium conversion before it. In *Da Vinci Group*, a commercial warehouse had been informally converted into apartments by 1980 and several years later, following substantial renovations to bring the residential units up to code, was awarded its first certificate of occupancy. (*Da Vinci Group, supra*, 5 Cal.App.4th at p. 27.) The property owner argued the building was exempt as " 'new construction' " from San Francisco's rent ordinance. (*Id*. at p. 28.) Similarly to the first exemption adopted in Costa-Hawkins, that ordinance excluded " 'rental units located in a structure for which a certificate of occupancy was first issued after the effective date of this ordinance.' " (*Ibid*.) The appellate court upheld the local agency's determination that this exclusion did not apply, although "[a]t first glance" it appeared to, because the belatedly obtained certificate of occupancy merely legalized residential use that was already occurring. (*Id*. at pp. 28–30.) The certificate of occupancy was new, but the "units were not newly constructed,

12

nor was the building restructured to permit new residential use," the *Da Vinci Group* court explained. (*Id.* at p. 30.)

## II.

The central dispute between the parties in this case is over how broadly to read and apply *Burien*, *supra*, 230 Cal.App.4th at p. 1048. The trial court embraced the expansive language in which *Burien* expressed its holding, agreeing that the first exemption in section 1954.52(a) "refers to certificates of occupancy issued prior to residential use of the unit." (*Burien*, at p. 1042.) Before us, the Rent Board endorses this reading, while Landlords seek to limit and distinguish *Burien*.

## A.

Landlords' first argument is that the "plain language" of section 1954.52(a) compels a ruling in its favor because this first exemption unambiguously and categorically exempts properties receiving a certificate of occupancy after 1995. The problem with this statutory construction is that it is the same one the *Burien* court for good reason rejected. (*Burien*, *supra*, 230 Cal.App.4th at p. 1047.) We fail to see how the same statutory language can be read narrowly when applied to a condominium conversion in *Burien*—to reach only a certificate of occupancy that precedes residential use—but be read broadly to reach any certificate of occupancy after 1995 when, as here, a property owner converts a single-family home or rooming house to a triplex. It is the same statutory language in both cases. Landlords do not contend *Burien* was wrongly decided, and we see no principled basis for concluding that the nature of the residential use before or after conversion justifies a different construction of the statute.[3] Landlords would have us ignore this

---

[3] At oral argument, Landlords proposed a different construction—that we construe section 1954.52(a)(1) to cover any unit receiving a certificate of

issue by characterizing *Burien*'s holding as an "exception[]" to Costa-Hawkins that must be narrowly construed. But *Burien* does not carve out an exception to Costa-Hawkins, it interprets the exact statutory exemption that is at issue in this case.

Amici curiae California Apartment Association and San Francisco Apartment Association attempt to support Landlords' statutory construction by arguing that *Burien* erred in confining section 1954.52(a)'s first exemption to new construction. They contend that new construction is the subject matter of subdivision (a)(2), and that subdivision (a)(1) rests instead on a bright-line distinction between properties that have a certificate of occupancy after February 1, 1995 and properties that do not, regardless of when the properties are first put to residential use. We see two problems with this argument, besides its inconsistency with *Burien*.

First, amici curiae's reliance on section 1954.52, subdivision (a)(2) is misplaced. This second exemption in Costa-Hawkins continues protection from local rent control for units that were "newly constructed" *before* 1995— properties that were exempted by local rent-control ordinances when new, before the enactment of Costa-Hawkins. (§ 1954.52(a)(2).) Subdivision (a)(2) grandfathers in the exemption for these no-longer new buildings. Subdivision (a)(1), by contrast, protects buildings that are actually new, in that they first receive a certificate of occupancy for residential use *after* February 1, 1995.

---

occupancy after February 1, 1995 except where a current tenancy began before the new certificate of occupancy issued. This carve-out for holdover tenants would have provided relief to the individual who filed suit in *Burien* but would not have closed the section 1954.52(a)(1) loophole for condominium conversions, as *Burien* did. Landlords' belatedly proposed construction is inconsistent with much of the language and logic of *Burien* and fails to harmonize the first and third exemptions in section 1954.52(a).

14

Second, amici's reliance on the distinction between a building receiving a certificate of occupancy and a building being newly constructed founders on legislative history that equates these two circumstances. A Senate Floor Analysis explained that the bill that became Costa-Hawkins would "[e]xempt *newly constructed units* from rent control." (Sen. Rules Com., Off. of Sen. Floor Analysis of Assem. Bill No. 1164 (1995–1996 Reg. Sess.), date July 23, 1995, page 2 (Sen. Floor Analysis), italics added.) The context for this statement makes clear it was meant to describe the proposed provisions, then in final form, that would become section 1954.52, subdivisions (a)(1) and (a)(2).[4] A similar analysis in the Assembly states the bill "[e]xempts from local controls *any new construction* which is issued a certificate of occupancy after February 1, 1995, and exempts from local controls any residential real property which is already exempt from local controls as of February 1, 1995 pursuant to a local exemption for newly-constructed units." (Assem. Housing and Community Development Com., Concurrence in Sen. Amendments to Assem. Bill No. 1164 (1995–1996 Reg. Sess.), date July 24, 1995, at p. 4

---

[4] This report was published as the Senate was considering whether to amend Assembly Bill No. 1164 to incorporate the provisions of Senate Bill No. 1257 (1995–1996 Reg. Sess.), which had passed the Senate and which "would: [¶] . . . Exempt newly constructed units from rent control. Preempt local rent control provisions which impose vacancy controls . . . . [¶] . . . [¶] . . . Preempt local rent controls on the rental of 'single family' dwellings . . . . [¶] . . . Leave intact local authority to regulate or monitor the grounds for eviction." (Sen. Floor Analysis, at pp. 2–3.) After the Senate agreed to these amendments and Assembly Bill No. 1164 became law, the described provisions were codified, respectively, as Civil Code sections 1954.52(a)(1) & (2), 1954.53, 1954.52(a)(3), and 1954.52, subdivision (c). That no separate mention was made of certificates of occupancy in this otherwise comprehensive account of the contents of the bill confirms that the Legislature intended a "certificate of occupancy" to serve as a proxy for a "newly constructed unit[]" in section 1954.52(a)(1). (Sen. Floor Analysis, at p. 2.)

(Assem. Analysis), italics added.)  This description clearly refers to proposed language that would become section 1954.52, subdivisions (a)(1) and (a)(2), respectively.

Driving home the emphasis on new construction, the same Assembly Analysis continued:  of the fourteen cities that then imposed residential rent control, the *only ones that did "not exempt new construction* from rent control, and therefore, *would be affected* by this bill [were] East Palo Alto, Cotati (partial exemption) and Los Gatos (partial exemption)."  (Assem. Analysis, *supra*, at p. 5, italics added.)  "Proponents contend that a statewide new construction exemption is necessary to encourage construction of much needed housing units, which is discouraged by strict local rent controls," this Analysis continued.  (*Id*. at p. 7.)  The Assembly, in other words, voted for Costa-Hawkins on the understanding that the first exemption in section 1954.52(a) would extend "statewide" an exemption for "new construction," and would affect only those jurisdictions that did not already "exempt new construction from rent control."  (Assem. Analysis, at p. 7.)[5]

---

[5] Landlords point to the legislative history of an earlier, unsuccessful effort to limit rent control as support for their reading of Costa-Hawkins's first exemption.  Assembly Bill No. 483 (1985–1986 Reg. Sess.) (Assem. Bill 483), by the same author, would have exempted rental units "first occupied by a tenant . . . after the effective date of the bill."  (Legislative Counsel's Digest, Jan. 30, 1985.)  Landlords assert that by later choosing different language for the first exemption in Costa-Hawkins, the Legislature evinced an intent to exempt a larger swath of properties than the newly occupied units described in Assem. Bill 483.  The problem with this argument is that we have no way of knowing whether, when the Legislature chose different language for Costa-Hawkins, it was trying to convey the same idea as in Assem. Bill 483 with words it considered more precise or, as Landlords would have it, was trying to convey a different idea.  We therefore find the Legislature's unsuccessful effort to pass AB 483 unenlightening.  (See *Reznitskiy v. County of Marin* (2022) 79 Cal.App.5th 1016, 1033 [unpassed

16

We recognize that a certificate of occupancy is sometimes required in the absence of new construction.  Under the state Building Code, a certificate of occupancy must issue (1) before a building or portion of a building may be occupied *and* (2) when a change in the occupancy classification of an existing structure is made.  (Cal. Code Regs., tit. 24, Part 2, § 111.1; 7 Miller and Starr, Cal. Real Estate (4th ed. 2022) § 25.40.)  The first circumstance describes new construction, but the second does not, as it comes into play when a landowner converts residential space from one occupancy classification to another.  As relevant here, the Building Code requires a certificate of occupancy when a single-family home is converted to a triplex, since a single-family home fits occupancy classification R-3 and a triplex, as a multiple dwelling unit, is occupancy classification R-2.  (Cal. Code Regs., tit. 24, Part 2, § 310.)  In parallel with the Building Code, the City of Berkeley's "Guidelines for Issuance of Certificates of Occupancy," *supra*, state, "projects which result in the construction of new buildings *or* changes in the existing use or occupancy classification of a building or portion thereof will be issued a separate certificate of occupancy by the City of Berkeley Building Official."  (Italics added.)

Nothing in the language of the statute or in the legislative history we have reviewed suggests that the Legislature considered that a certificate of occupancy would issue when space, already in residential use, was converted to a different category of residential use.  On the contrary, the contemporaneous records of both the Senate and Assembly reveal that what the Legislature thought it was doing with section 1954.52(a)(1) was exempting new construction from local rent control, so long as a property

_____

bills subject to conflicting inferences]; *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 29 [" 'Unpassed bills, as evidences of legislative intent, have little value' "].)

17

owner played by the rules and obtained a certificate of occupancy. Consistent with this legislative understanding, and for all the compelling reasons given in *Burien*, we accordingly construe section 1954.52(a)(1) as "refer[ring] to certificates of occupancy issued prior to residential use" of the affected property. (*Burien, supra*, 230 Cal.App.4th at p. 1042.) This is a statutory construction that "furthers the purpose of the exemption by encouraging construction" of new buildings, as well as conversions that "add to the residential housing supply." (*Id*. at p. 1047.) It is a construction that aligns with the words of the statute and harmonizes subdivision (a)(1) with the language added to subdivision (a)(3) in 2001. (*Burien*, at p. 1047.) And it is the construction that " 'comports most closely with the apparent intent of the Legislature' " as expressed in the legislative history, to exempt new construction statewide. (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199; see also *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose"].)

B.

Landlords next contend that even if the first exemption in section 1954.52(a) applies only to those certificates of occupancy that precede residential use of a unit and expand the supply of housing, their properties in this case qualify for the exemption. Emphasizing that their buildings were run-down, unoccupied single-family homes, Landlords assert that they expanded and improved the living spaces, enabled the properties to house more people, and created triplex units that had not previously existed. This was no mere " ' "paperwork" ' " conversion, Landlords persuasively contend. (*Burien, supra*, 230 Cal.App.4th at p. 1047.) We acknowledge the renovations were extensive and increased the ability of both buildings to house tenants,

18

but conclude the factual differences between this case and *Burien* do not compel a different result here.

Landlords assert that each property houses more tenants now than it could before the conversion. Each building has more or larger bedrooms; additional kitchens, living rooms, and bathrooms; and more square footage of habitable space than before the renovations. But in comparing the total livable space in the building before and after renovations, Landlords draw the wrong comparison. They ignore that the Rent Board properly determined one unit in each building is exempt from rent control as new construction. Landlords do not contend that if we were to consider only the two contested units in each building, these units can house more tenants than could the entire building in the years before its renovation. Our review of the record suggests this more appropriate comparison, had they made it, would not favor Landlords. We note, for example, that the square footage of residential space that Landlords added appears to be less than the square footage of the two units the Rent Board has already exempted from rent control.[6]

Landlords also assert their buildings were derelict and unoccupied before renovations began, in the case of Dana Street "unfit for human habitation." To the extent Landlords contend that whenever renovations improve the condition of a rental property, those improvements take that property outside the reach of local rent control, Landlords offer no legal support for this contention. To the extent Landlords intend this line of

---

[6] Landlords described the Dana Street project to the Zoning Appeal Board as adding about 1,245 square feet of floor space, with a new third-floor unit (later exempted from rent control) exceeding 1,700 square feet. And the Warring Street project they described as adding 645 square feet of new floor area, mostly in a basement unit that would total 1,254 square feet and that would later be exempted from rent control.

reasoning to apply only for renovations that are sufficiently extensive, they offer no principle to distinguish such renovations from renovations insufficient to invoke the exception. Also, any interpretation of Costa-Hawkins that allows the renovation of properties in poor condition to remove them from the reach of local rent control would perversely reward landlords for allowing rental units to decay to the point the buildings need extensive rehabilitation. We see no indication the Legislature intended that result here.[7] Nor do we consider it significant that Landlords' properties were unoccupied when renovations began. Especially with buildings near campus that house a rotating cast of students, we can hardly infer from the absence of tenants immediately before renovations began that the buildings were in fact uninhabitable. Indeed, the City's assessment that Dana Street could not "be legally inhabited" appears to have been based on conditions in (or before) 2005, and yet all 12 Dana Street units were reportedly occupied between 2006 and 2008. And even if we were to conclude that Costa-Hawkins intended to reward Landlords for remedying the conditions that made the third floor of Dana Street an uninhabitable fire hazard by removing that portion of the building from rent control, well, the Rent Board has already taken this step.

In seeking factual support for their application of Costa-Hawkins, Landlords misinterpret the certificates of occupancy. They contend that their certificates issued as a result of "complete structure changes—resulting in highly expanded residential use." (Italics omitted.) But there is no reference anywhere on either certificate of any expansion in the residential use of these

---

[7] The Legislature separately addressed the subject of dilapidated units in section 1954.52, subd. (d), but no party asserts that provision of Costa-Hawkins applies in this case.

buildings, and the reference on the certificates to a complete structural change is taken out of context.  When a certificate of occupancy issues, it must include a dozen different pieces of information, including "a description of that portion of the structure for which the certificate is issued."  (Cal. Code Regs., tit. 24, Part 2, § 111.2.)  Here, both certificates of occupancy indicate the new "Occupancy Group: R-2" and, for the "portion of the structure for which the certificate is issued," state:  "Entire structure.  Change from 2-story single family residence to a triplex" (Warring) or "Complete structure change from single family dwelling to three unit residential building" (Dana).  This language merely establishes, as to each certificate of occupancy, that it governs the entire building as opposed to only a portion of it, and that the building has been converted from a single-family residence to a triplex.  This language says nothing about the extent of the physical changes that made the conversion possible.

Finally, Landlords suggest that because these certificates of occupancy recognize three new units, no one of which existed before the conversion, the units come within the first Costa-Hawkins exemption as it is construed in *Burien*.  Landlords undercut their own argument, however, with an admission in their brief opposing an amicus brief filed by the City of Oakland and the City and County of San Francisco in support of the Rent Board.  Landlords concede, in responding to the hypothetical of an owner who divided a two-bedroom unit into two one-bedroom units, that "*Burien*'s prohibition on paperwork conversions would likely cover this scenario."  But if converting a two-bedroom unit to two one-bedroom units does not remove a hypothetical property from the jurisdiction of the Rent Board, we fail to see how converting a property into three units that is either a single large unit or

21

many small units (depending whether one references legal or actual occupancy) could have any different effect.

Having walked back their final argument, Landlords appear to be relying on some mix of the arguments we have already rejected. Landlords contend their certificates of occupancy are not "based solely on a change in use from one type of residential housing to another" (quoting *Burien*, *supra*, 230 Cal.App.4th at p. 1047) because their projects undertook to do much more than merely convert to triplexes. But Landlords have not established that modestly expanding the living space or extensively renovating the buildings suffices to remove all six of the new units from the reach of local rent control, rather than the single unit in each building that was properly deemed exempt. In sum, we see no reason to abandon the statutory construction of Costa-Hawkins's first exemption that was adopted in *Burien*, and we agree with the Rent Board that, applying that construction here, only one of three units in each of Landlords' buildings is exempt from local rent control.

C.

Landlords also contend that Resolution 17-13 "conflicts with Costa-Hawkins on its face and as applied," and leads to an application of the Rent Ordinance that is contrary to Costa-Hawkins. Resolution 17-13 is thus preempted by state law, as is the Rent Ordinance as applied here, they contend. The conclusions we have already reached about the first exemption in section 1954.52(a) make quick work of these contentions.

Local governments may make and enforce rent control "ordinances and regulations not in conflict with" state law. (Cal. Const., art. XI, § 7; see also *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 140.) If Resolution 17-13 or the Rent Ordinance were to conflict with Costa-Hawkins, they would be to

22

that extent without effect.  This much is clear from the opening words of section 1954.52(a):  "Notwithstanding any other provision of law . . . ."

But we see no inconsistency between Costa-Hawkins, properly construed, and Resolution 17-13.  Resolution 17-13 interprets the Rent Ordinance in terms drawn directly from *Burien*, *supra*, 230 Cal.App.4th at p. 1042.  "A rental unit with a certificate of occupancy issued after residential use of the unit began shall not qualify as exempt" from Berkeley rent control, states Resolution 17-13.  Reaffirming *Burien* today, we find no conflict between the principle articulated in Resolution 17-13 and Costa-Hawkins.  We thus reject the facial and as-applied challenges to Resolution 17-13 and the Rent Ordinance it construes.

## DISPOSITION

The judgment of the trial court is affirmed.  Appellants are to pay costs on appeal.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

23

Trial Court: Alameda County Superior Court

Trial Judge: Hon. Stephen D. Kaus

Counsel: Zacks, Freedman & Patterson, Scott A. Freedman, and Emily L. Brough for Plaintiffs and Appellants

Dowling & Marquez, Curtis F. Dowling for California Apartment Association and San Francisco Apartment Association as Amici Curiae on behalf of Plaintiffs and Appellants

City of Berkeley Rent Stabilization Board, Matthew Brown, Matthew Jay Siegel, Hannah Kim; Goldfarb & Lipman and James T. Diamond, Jr. for Defendants and Respondents

Barbara J. Parker City Attorney, Maria Bee, Chief Assistant City Attorney, Laura Lane, Supervising Deputy City Attorney, and Braz Shabrell, Deputy City Attorney (City of Oakland); David Chiu, City Attorney, Yvonne Mere, Chief Deputy City Attorney, Tara Steeley, Deputy City Attorney, and Manu Pradhan, Deputy City Attorney (City & County of San Francisco) for City of Oakland and City of San Francisco as Amici Curiae on behalf of Defendants and Respondents

*NCR Properties, LLC v. City of Berkeley et al.* (A163003)