Filed 10/22/14

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| BURIEN, LLC, | B250182 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC114545) |
| v. | |
| JAMES A. WILEY, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles, Gerald Rosenberg, Judge. Affirmed.

Dennis P. Block & Associates, Dennis P. Block, Daniel Costas, for Plaintiff and Appellant.

Campbell & Farahani, Frances M. Campbell, Nima Farahani, for Defendant and Respondent.


_____

A landlord converted a rent-controlled apartment building to condominiums, obtained a new certificate of occupancy in 2009 based on the change in use, and raised the rent. When a tenant objected, the landlord sought a declaration from the court that the unit was exempt from local rent control ordinances under the Costa-Hawkins Rental Housing Act (Civ. Code, § 1954.50, et seq.).[1] The trial court found the unit was not exempt and entered judgment in favor of the tenant. On appeal, the landlord contends the unit is exempt from rent control under section 1954.52, subdivision (a)(1), which provides an exemption for units that have a certificate of occupancy issued after 1995. We conclude section 1954.52, subdivision (a)(1), refers to certificates of occupancy issued prior to residential use of the unit. We affirm.

## FACTS AND PROCEDURAL HISTORY

A certificate of occupancy was issued in 1972 for the apartment building at issue on Sawtelle Boulevard in Los Angeles, California. Defendant and respondent James A. Wiley (Tenant) leased a unit in the building in 1981. Tenant's rent was controlled by the Los Angeles Rent Stabilization Ordinance (Los Angeles Mun. Code, § 151.00 et seq.) (LARSO). The Costa-Hawkins Rental Housing Act, effective January 1, 1996, exempted certain units from local rent control ordinances, including units with a certificate of occupancy issued after 1995 and condominiums meeting certain conditions.

Plaintiff and appellant Burien, LLC (Landlord) purchased the building. Landlord converted the building to condominiums and obtained a new certificate of occupancy in 2009 based on the change of use from apartments to condominiums. On March 17, 2011, Landlord served Tenant with a 60-day notice of change of terms of tenancy stating the rent would be increased from $1,401 to $3,000 per month. Tenant refused to pay the

---

[1] All further statutory references are to the Civil Code, unless otherwise stated.

increased amount. The Los Angeles Housing Department sent a letter to Landlord stating the attempted rent increase violated LARSO. The Housing Department referred the matter to the City Attorney's Office for further proceedings.

On October 19, 2011, Landlord filed a complaint against Tenant for declaratory relief and intentional interference with prospective economic advantage. A bench trial was held on June 25, 2013. The trial court concluded the rent increase violated LARSO. Landlord filed a premature notice of appeal from the ruling. The court entered judgment in favor of Tenant on July 22, 2013. In the interests of justice, we treat the notice of appeal as filed immediately after entry of the July 22, 2013 judgment. (Cal. Rules of Court, rule 8.104(d)(2).)

## DISCUSSION

### Standard of Review and Principles of Statutory Interpretation

The interpretation of a state statute presents a question of law, which we review de novo. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 21.) Well-established rules govern construction of a statute. Our primary task is to determine the intent of the legislative body, so as to construe the statute to effectuate that purpose. (*Doe v. Brown* (2009) 177 Cal.App.4th 408, 417.) We begin with the words of the statute. (*Ibid*.) "Words used in a statute or constitutional provision should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . . [Citations.]" (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

But the court is not prohibited "from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and

3

provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.]  Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.  The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.  [Citations.]  An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation.]."  (*Lungren v. Deukmejian*, *supra*, 45 Cal.3d at p. 735.)

"If . . . the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we will 'examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes,' and we can ""'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.''"  [Citation.]"  (*Pacific Sunwear of California, Inc. v. Olaes Enterprises, Inc.* (2008) 167 Cal.App.4th 466, 474.)

"'We must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]"  (*Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199.) "We presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules.  [Citation.]"  (*Manhattan Loft, LLC v. Mercury Liquors, Inc.* (2009) 173 Cal.App.4th 1040, 1056.)


**Exemption Based on Certificate of Occupancy**


Landlord contends Tenant's unit is exempt from rent control under section 1954.52, subdivision (a)(1), because a certificate of occupancy was issued for the unit after February 1, 1995.  Tenant contends the exemption refers to the first certificate of

occupancy issued for the unit, and does not apply in this case, because his tenancy was established long before the new certificate of occupancy. We conclude the language of subdivision (a)(1), standing alone, is susceptible to both parties' constructions, but reading the section as a whole, the exemption can only apply to certificates of occupancy that precede residential use of the unit.

Section 1954.52, subdivision (a), provides three exemptions from local rent control laws, any of which allow an owner to establish the initial and subsequent rental rates for a unit.[2] The first exemption is for a unit that has "a certificate of occupancy issued after February 1, 1995." (§ 1954.52, subd. (a)(1).) The second exemption is for

---

[2] Section 1954.52, subdivision (a), as originally enacted, provided: "Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or unit about which any of the following is true: [¶] (1) It has a certificate of occupancy issued after February 1, 1995. [¶] (2) It has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units. [¶] (3) It is alienable separate from the title to any other dwelling unit or is a subdivided interest in a subdivision as specified in subdivision (b), (d), or (f) of Section 11004.5 of the Business and Professions Code. This paragraph shall not apply to a dwelling or unit where the preceding tenancy has been terminated by the owner by notice pursuant to Section 1946 or has been terminated upon a change in the terms of the tenancy noticed pursuant to Section 827. [¶] Where a dwelling or unit in which the initial or subsequent rental rates are controlled by an ordinance or charter provision in effect on January 1, 1995, the following shall apply: [¶] (A) An owner of real property as described in this paragraph may establish the initial and all subsequent rental rates for all existing and new tenancies in effect on or after January 1, 1999, if the tenancy in effect on or after January 1, 1999, was created between January 1, 1996, and December 31, 1998. [¶] (B) Commencing on January 1, 1999, an owner of real property as described in this paragraph may establish the initial and all subsequent rental rates for all new tenancies if the previous tenancy was in effect on December 31, 1995. [¶] (C) The initial rental rate for a dwelling or unit as described in this paragraph in which the initial rental rate is controlled by an ordinance or charter provision in effect on January 1, 1995, may not, until January 1, 1999, exceed the amount calculated pursuant to subdivision (c) of Section 1954.53. An owner of residential real property as described in this paragraph may, until January 1, 1999, establish the initial rental rate for a dwelling or unit only where the tenant has voluntarily vacated, abandoned, or been evicted pursuant to paragraph (2) of Section 1161 of the Code of Civil Procedure."

5

units already exempt from rent control "pursuant to a local exemption for newly constructed units." (§ 1954.52, subd. (a)(2).) The third exemption is for a unit that is "alienable separate from the title to any other dwelling unit or is a subdivided interest in [a community apartment project, a stock cooperative project, or a limited equity housing cooperative]." (§ 1954.52, subd. (a)(3).) Condominium units are included in the third exemption, because they are alienable separate from the title to any other dwelling unit. The third exemption does not apply if the prior tenancy terminated because the landlord served a notice of termination or a change in the tenancy's terms.

Effective January 1, 2002, the Legislature amended the third exemption for condominium units to exclude "[a] condominium dwelling or unit that has not been sold separately by the subdivider to a bona fide purchaser for value . . . . However, if a condominium dwelling or unit meets the criteria of paragraph (1) or (2) of subdivision (a), or if all the dwellings or units except one have been sold separately by the subdivider to bona fide purchasers for value, and the subdivider has occupied that remaining unsold condominium dwelling or unit as his or her principal residence for at least one year after the subdivision occurred, then subparagraph (A) of paragraph (3) shall apply to that unsold condominium dwelling or unit." (§ 1954.52, subd. (a)(3)(B)(ii).)[3]

---

[3] Section 1954.52, subdivision (a), currently provides: "Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit about which any of the following is true: [¶] (1) It has a certificate of occupancy issued after February 1, 1995. [¶] (2) It has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units. [¶] (3)(A) It is alienable separate from the title to any other dwelling unit or is a subdivided interest in a subdivision, as specified in subdivision (b), (d), or (f) of Section 11004.5 of the Business and Professions Code. [¶] (B) This paragraph does not apply to either of the following: [¶] (i) A dwelling or unit where the preceding tenancy has been terminated by the owner by notice pursuant to Section 1946.1 or has been terminated upon a change in the terms of the tenancy noticed pursuant to Section 827. [¶] (ii) A condominium dwelling or unit that has not been sold separately by the subdivider to a bona fide purchaser for value. The initial rent amount of the unit for purposes of this chapter shall be the lawful rent in effect on May 7, 2001, unless the rent amount is governed by a different provision of this chapter. However, if a condominium dwelling or

The legislative history of the amendment is instructive.  As explained in the analysis by the Assembly Committee on the Judiciary on Senate Bill No. 985 (2001-2002 Reg. Sess.) as amended May 17, 2001, at pages 5-6:  "According to the sponsors, this amendment is necessary to close a loophole in law that allows landlords to avoid local rent control laws.  The exemption was originally created to spur construction of condominiums, seen as an affordable housing alternative, and in recognition that condominiums were built with the same purpose as apartment units.  [¶]  However, the language was broadly written and, as a consequence, some apartment property owners have taken advantage of the law by obtaining a permit to convert to condominiums, but never completing the process.  In the meanwhile, the property owners continue to rent the apartment units, free from local rent controls because of the Costa-Hawkins exemption.  In some cases, proponents assert, the condo-conversion permits were pulled up to eight years ago, but the owners are still renting the unit to tenants.  This bill would close that

unit meets the criteria of paragraph (1) or (2) of subdivision (a), or if all the dwellings or units except one have been sold separately by the subdivider to bona fide purchasers for value, and the subdivider has occupied that remaining unsold condominium dwelling or unit as his or her principal residence for at least one year after the subdivision occurred, then subparagraph (A) of paragraph (3) shall apply to that unsold condominium dwelling or unit.  [¶]  (C)  Where a dwelling or unit in which the initial or subsequent rental rates are controlled by an ordinance or charter provision in effect on January 1, 1995, the following shall apply:  [¶]  (i)  An owner of real property as described in this paragraph may establish the initial and all subsequent rental rates for all existing and new tenancies in effect on or after January 1, 1999, if the tenancy in effect on or after January 1, 1999, was created between January 1, 1996, and December 31, 1998.  [¶]  (ii)  Commencing on January 1, 1999, an owner of real property as described in this paragraph may establish the initial and all subsequent rental rates for all new tenancies if the previous tenancy was in effect on December 31, 1995.  [¶]  (iii)  The initial rental rate for a dwelling or unit as described in this paragraph in which the initial rental rate is controlled by an ordinance or charter provision in effect on January 1, 1995, may not, until January 1, 1999, exceed the amount calculated pursuant to subdivision (c) of Section 1954.53. An owner of residential real property as described in this paragraph may, until January 1, 1999, establish the initial rental rate for a dwelling or unit only where the tenant has voluntarily vacated, abandoned, or been evicted pursuant to paragraph (2) of Section 1161 of the Code of Civil Procedure."

7

loophole and provide that the exemption would apply only when the unit is sold separately to a bona fide purchaser for value. Thus, apartment units that have remained rentals would be subject to local rent control laws."

"After the Legislature passed the bill and sent it to Governor Davis for signature, its author (Senator Sheila James Kuehl) wrote the governor: '[T]he bill closes a loophole in Costa-Hawkins that allows landlords to . . . raise rents by falsely "preparing" to convert a rental unit to a condominium. Under [Senate Bill] 985, in cities that have rent control, the landlord would be required to actually sell a unit, rather than merely initiate the conversion paperwork, in order to have rent controls removed.'" (*City of West Hollywood v. 1112 Investment Co.* (2003) 105 Cal.App.4th 1134, 1144.)

When a building is constructed, added on to, or altered, a certificate of occupancy is generated at the conclusion of all inspections to certify that the building meets local building code requirements for occupancy. A common sense interpretation of section 1954.52, subdivision (a)(1), is that it excludes buildings from rent control that are certified for occupancy after February 1, 1995. Buildings that were certified for occupancy prior to February 1, 1995, are not excluded. This interpretation furthers the purpose of the exemption by encouraging construction and conversion of buildings which add to the residential housing supply. In this case, because Landlord's building was certified for occupancy long before February 1, 1995, it is not excluded from rent control.

Landlord, reading subdivision (a)(1) in isolation, contends the plain language does not limit the exemption to the initial certificate of occupancy and instead applies broadly to any certificate of occupancy issued after February 1, 1995. Although the language is susceptible to this construction, the result does not further the purpose of the statute. A certificate of occupancy based solely on a change in use from one type of residential housing to another does not enlarge the supply of housing.

Landlord's construction would also render the exclusion of certain condominium units in subdivision (a)(3) nugatory. In 2002, in order to curb abuse of section 1954.52 through false condominium conversions, the Legislature carefully excluded condominium units which have not been sold separately to a bona fide purchaser. If a

certificate of occupancy issued after February 1, 1995, based on a change in use from apartments to condominiums triggers the exemption under subdivision (a)(1), there would never be a determination under subdivision (a)(3) of whether the unit was sold separately to a bona fide purchaser. A unit would always qualify for the exemption under subdivision (a)(1) based on the new certificate of occupancy. Interpreting section 1954.52, subdivision (a)(1) to apply to any certificate of occupancy issued after 1995 would circumvent the tenant protection enacted by the Legislature under subdivision (a)(3) for buildings converted to condominiums. Landlord's suggestion that tenant protection created in 2002 applies only to condominium conversions initiated prior to the effective date of the original statute more than seven years earlier is untenable. The Legislature amended section 1954.52 to remedy an abuse that was permissible under the broad language of the original statute. The plain language and intent of the provision is to provide protection to tenants in condominium conversions from the effective date of the legislation into the future.

Similar exemptions in local rent control ordinances encourage the creation of new residential housing. For example, LARSO exempts housing from rent control if the first certificate of occupancy was issued after October 1, 1978, unless the building was first occupied for residential purposes prior to October 1, 1978. It states in pertinent part: "Housing accommodations, located in a structure for which the first Certificate of Occupancy was issued after October 1, 1978, are exempt from provisions of this Chapter. If the property was occupied for residential purposes prior to October 1, 1978, and a Certificate of Occupancy for the subject building was never issued or was not issued until after October 1, 1978, the housing accommodation shall be subject to the provisions of this Chapter if relevant documentation, such as a building permit, establishes that the building was first occupied for residential purposes prior to October 1, 1978." (Los Angeles Mun. Code, § 151.02.)

The City of Oakland's Residential Rent Adjustment Program provides a similar exemption from rent control: "Dwelling units which were newly constructed and received a certificate of occupancy on or after January 1, 1983. This exemption does not

9

apply to any newly constructed dwelling units that replace covered units withdrawn from the rental market in accordance with O.M.C. 8.22.400, et seq. (Ellis Act Ordinance). To qualify as a newly constructed dwelling unit, the dwelling unit must be entirely newly constructed or created from space that was formerly entirely non-residential." (Oakland Mun. Code, § 8.22.030, subd. (A)(5).)

In *Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24 (*Da Vinci*), the appellate court considered the scope of the exemption under San Francisco's Residential Rent Stabilization and Arbitration Ordinance. The San Francisco ordinance exempts "[r]ental units located in a structure for which a certificate of occupancy was first issued after the effective date of this ordinance [in 1979.]" (S.F. Admin. Code, ch. 37, § 37.2, subd. (r)(5).) In *Da Vinci*, a commercial warehouse built in 1905 was used residentially beginning in 1980, renovated, and granted a certificate of occupancy in 1986. The local rent control board interpreted the rent control exemption to apply only to newly constructed rental units, or converted warehouses with new certificates of occupancy when there had been no prior residential use. The *Da Vinci* court concluded the board's interpretation was consistent with the "goal of easing the housing shortage by encouraging creation of new residential rental units where there were none before." (*Da Vinci, supra,* at p. 30.) The certificate of occupancy for the warehouse property created legal residential units from existing residential use, but did not enlarge the city's available housing. (*Ibid*.) The units did not qualify for the exemption, because they "were not newly constructed, nor was the building restructured to permit new residential use." (*Ibid*.)

In this case, Tenant's unit is not exempt under subdivision (a)(1) of section 1954.52, because Tenant occupied the unit prior to the issuance of the 2009 certificate of occupancy. The 2009 certificate of occupancy did not precede the residential use of the property. The trial court properly determined Tenant's unit was subject to rent control and not exempt. We affirm the judgment.

## DISPOSITION

The judgment is affirmed.  Respondent James A. Wiley is awarded his costs on appeal.


KRIEGLER, J.

We concur:


TURNER, P. J.


MOSK, J.