Filed 8/29/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CP VI ADMIRALS COVE, LLC,<br><br>  Plaintiff and Respondent,<br><br>     v.<br><br>CITY OF ALAMEDA et al.,<br><br>  Defendants and Appellants. | A170689, A170986<br><br>(Alameda County<br>Super. Ct. No. 23CV044259) |

A developer purchased property in Alameda known as Admirals Cove from the United States Navy, and improved it by rehabilitating 150 residential units on the property that previously had been used as housing for military personnel and their families. At issue here is whether the renovated residential units are subject to the City of Alameda's Rent Control Ordinance (Alameda Mun. Code, ch. VI, art. XV, § 6-58.10 et seq.) (Rent Ordinance).

When a dispute arose about the applicability of the Rent Ordinance, the developer and now landlord—CP VI Admirals Cove, LLC (Carmel Partners or Carmel)—argued the units are exempt from local rent control. The Costa-Hawkins Rental Housing Act (Civ. Code,[1] § 1954.50 et seq.) (Costa-Hawkins) exempts from local rent control residential units that have a

---

[1] Undesignated statutory references are to the Civil Code.

1

certificate of occupancy issued after February 1, 1995. (§ 1954.52, subd. (a)(1).)

The City of Alameda (the City) and its rent program director (the Rent Program Director) disagreed that the residential units at issue here are exempt under Costa-Hawkins, pointing to the fact the units had been used as living accommodations for military personnel before the current certificate of occupancy issued. The Rent Program Director determined that the units had only been converted from one form of residential use to another and did not represent an expansion of the housing stock.

An administrative hearing officer upheld the Rent Program Director's determination. The trial court, however, granted Carmel's petition for writ relief, finding that the exemption from local rent control applies and that the Admirals Cove development "effectively qualifies as new residential housing stock." The City and its fellow defendants below—the City Council of the City of Alameda (the City Council) and the Rent Program Director—appealed from the trial court's ensuing judgment.[2]

We conclude that, under *NCR Properties, LLC v. City of Berkeley* (2023) 89 Cal.App.5th 39 (*NCR Properties*) and *Burien, LLC v. Wiley* (2014) 230 Cal.App.4th 1039 (*Burien*), the exemption from local rent control set forth in section 1954.52, subdivision (a)(1) (section 1954.52(a)(1)) does not apply here in light of the prior residential use of the Admirals Cove property. We therefore reverse.

---

[2] We will sometimes refer to these parties collectively as the City or the defendants.

2

# I. BACKGROUND[3]

## A. *The Admirals Cove Property*

The Admirals Cove property was owned by the federal government from approximately 1930 to 2018. In 1969, the federal government constructed about 150 residential units and supporting infrastructure on the property. From 1969 until about 1997, the residential units were used by, and were available only to, active enlisted Navy personnel stationed at Naval Air Station Alameda and their families. The units were not available to the general public. Enlisted personnel stationed at the base could apply to the Navy to live elsewhere if there were more assigned personnel than military family units available. No certificates of occupancy were issued by the City or any other state or local agency when the units were built by the federal government.

From about 1997 until about 2005, the United States Coast Guard used the federal government-owned housing at Admirals Cove for Coast Guard personnel and their families. Similar to the Navy's earlier use, only enlisted active Coast Guard personnel stationed in Alameda and their families were

---

[3] In connection with the administrative proceedings in this matter, the parties stipulated to certain background facts pertaining to the Admirals Cove property and the development at issue here, as well as the procedural history of the parties' dispute. In setting forth the relevant background, we rely in part on those stipulated facts, the exhibits that accompanied the parties' stipulation, and other evidence that was presented in the administrative proceeding (all of which was submitted to the trial court).

We granted the City's unopposed request that we take judicial notice of (1) several documents that were filed in the trial court but were omitted from the clerk's transcript on appeal, and (2) a City ordinance that was considered by the hearing officer during the administrative proceedings. We also granted leave for the Santa Monica Rent Control Board and the Berkeley Rent Stabilization Board to file a joint brief as amici curiae in support of the City; Carmel filed a response to the amicus brief.

eligible to live in the units; they were not available to the general public. Such personnel could apply to the Coast Guard to live elsewhere if there were more assigned personnel than military family units available.

The housing units at Admirals Cove were vacant from 2005, when the Coast Guard stopped using the property, until Carmel purchased the property in 2018 at a public auction. During the period when the residential units were vacant, they "fell into considerable disrepair," and they "were not suitable for occupancy upon transfer."

Carmel initially planned to demolish the military housing and construct new buildings on the site to be used as rental housing. But Carmel concluded that rehabilitation of the existing buildings would be more cost-effective and environmentally beneficial and would enable the units to be made available for public occupancy sooner.

As part of the development process, Carmel and the City negotiated a memorandum of understanding (MOU) that required Carmel to take certain steps, including rebuilding or upgrading infrastructure such as sewer, water, and electrical systems. In addition, Carmel extensively renovated both the exteriors and interiors of the units themselves. Carmel spent a total of about $48 million to "bring[] the[] units to market," in addition to the $38 million purchase price to obtain the property from the Navy.

The City issued a final certificate of occupancy for the project in December 2020, and Carmel began renting the units to residential tenants. The final certificate of occupancy designated the occupancy as "new," rather than a "change."

## B. *Procedural Background*

In correspondence beginning in March 2023, the Rent Program Director took the position that Admirals Cove was not covered by the

4

section 1954.52(a)(1) exemption and was subject to all provisions of the City's rent control ordinance. Carmel disagreed and argued the exemption applied.

On April 3, 2023, the Rent Program Director issued a regulation "to clarify when the [Costa-Hawkins] exemption" from local rent control would apply. (City of Alameda Rent Program, Reg. 23-02 (Regulation 23-02), p. 2, ¶ 1; see <https://www.alamedarentprogram.org/files/sharedassets/ housingauth/v/1/policies-and-regulations/regulation-23-02-exemption-for-coo-issued-after-feb-1995.pdf> [as of Aug. 29, 2025]; see also Alameda Mun. Code, § 6-58.155 [Rent Program Director has "authority to promulgate regulations to implement the requirements and fulfill the purposes of" the Rent Ordinance].) Regulation 23-02 states the exemption "will not apply if the property for which the [certificate of occupancy] has been issued was used for residential purposes prior to February 1, 1995." (Reg. 23-02, p. 2, ¶ 3.) The regulation states the term "[r]esidential use" is to be "broadly construed to include all living accommodation uses, regardless of whether the accommodations were made available to the general public or restricted to a subset of the population by residency, employment, age, military status, income, group affiliation or other factors." (*Ibid.*)

On April 17, 2023, the Rent Program Director sent a "Final Determination Concerning Admirals Cove," in which he concluded that the "Admirals Cove project is subject to all provisions of the Rent Ordinance and therefore the property owner must immediately comply with it including registering all units with the Program, paying the Program fees, resetting all rent increases at the project that have been increased in violation of the Ordinance and reimbursing all tenants for the overcharges, and providing relocation payments to any tenant that received a rent increase of more than 10% and vacated the project." Carmel filed an administrative appeal in

May 2023.[4] In September 2023, an administrative hearing officer upheld the Rent Program Director's determination.

Also in September 2023, Carmel filed in the trial court a writ petition challenging the hearing officer's decision and naming as respondents the City, the City Council, and the Rent Program Director.[5] The petition asserts causes of action for: (1) administrative mandamus (citing Code Civ. Proc., §§ 1094.5, 1085); (2) declaratory relief (see Code Civ. Proc., § 1060); and (3) a refund of rent program fees (see Gov. Code, § 810 et seq.; Code Civ. Proc., § 1095).

The City answered the petition, and Carmel then filed a motion for judgment. After receiving briefing on the motion and hearing argument, the court ruled in favor of Carmel in an April 16, 2024 order. The court found section 1954.52(a)(1) applies to the Admirals Cove townhomes and exempts them from the rent stabilization provisions of the City's rent control ordinance. The court later entered judgment in favor of Carmel, granting writ relief and ordering that certain rent program fees be refunded.

The City filed notices of appeal challenging both the trial court's April 16, 2024 order and the court's final judgment. Pursuant to the parties' stipulation, we consolidated the two appeals.

---

[4] In addition to filing the administrative appeal, Carmel registered the rental units with the City's rent program, paid rent program fees that the City had assessed at "the rate applicable to 'fully regulated' rental units (*i.e.*, units that are not exempt from rent control under Costa-Hawkins)," and filed a refund claim with the City for the difference between the fees it paid and the lower amount that would be owed for partially regulated units.

[5] The City's hearing officer was also initially named as a respondent, but she was dismissed pursuant to the parties' stipulation in October 2023.

## II. DISCUSSION

### A. *Standard of Review*

We independently review questions of law, including questions of statutory interpretation. (*NCR Properties, supra,* 89 Cal.App.5th at pp. 46–47.) As both the administrative hearing officer and the trial court noted, the material facts here are undisputed, having been established pursuant to a detailed stipulation. We therefore review de novo the question presented in this appeal—whether the trial court correctly construed and applied Costa-Hawkins in determining that the Admirals Cove townhomes are exempt from local rent control. (See *NCR Properties,* at pp. 46–47 [independent review of construction and application of Costa-Hawkins in mandamus proceeding]; *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [mixed questions of law and fact that are "predominantly legal"].)[6]

### B. *Costa-Hawkins,* **Burien***, and* **NCR Properties**

"The Legislature enacted Costa-Hawkins in 1995 to moderate what it considered the excesses of local rent control. [Citation.] The act has two main sections. One section, not at issue in this case, prohibits vacancy control. With few exceptions, it gives California landlords the right to set the rent on a vacant unit at whatever price they choose. (Civ. Code, § 1954.53.) The provision at issue here goes further, where it applies. Civil Code section 1954.52, subdivision (a) (section 1954.52(a)), exempts three categories of rental property from rent control, even for existing tenancies.

---

[6] Because we conclude on de novo review that the hearing officer correctly found the section 1954.52(a)(1) exemption does not apply here, we need not address the City's argument that more deferential review of the hearing officer's decision (by both the trial court and this court) is appropriate.

"Section 1954.52(a) states, 'Notwithstanding any other provision of law, an owner of residential real property may establish the initial and all subsequent rental rates for a dwelling or a unit about which any of the following is true:  [¶] (1) It has a certificate of occupancy issued after February 1, 1995. [¶] (2) It has already been exempt from the residential rent control ordinance of a public entity on or before February 1, 1995, pursuant to a local exemption for newly constructed units. [¶] (3)(A) It is alienable separate from the title to any other dwelling unit . . . .'  This third exemption is complex, but for present purposes it suffices to observe that the third exemption generally includes single-family homes and condominiums, which are both separately alienable property interests." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 47.)

The dispute before us centers on the applicability of the first of these three exemptions—the exemption in section 1954.52(a)(1) for a dwelling or unit with a certificate of occupancy issued after February 1, 1995.  If we were to look only to the plain language of the exemption, it would apply to Admirals Cove, since the certificate of occupancy for the development was not issued until 2020.  But courts construing the section 1954.52(a)(1) exemption in light of its apparent purpose—to "encourag[e] construction and conversion of buildings which add to the residential housing supply" (*Burien, supra,* 230 Cal.App.4th at p. 1047; see *NCR Properties*, *supra*, 89 Cal.App.5th at pp. 53–54)—have held the exemption does not apply to every certificate of occupancy issued after February 1, 1995.  Instead, the appellate courts in *NCR Properties* and *Burien* interpreted section 1954.52(a)(1) to " 'refer[] to certificates of occupancy issued prior to residential use' of the affected property." (*NCR Properties*, at p. 54, quoting *Burien*, at p. 1042.)  A

8

certificate of occupancy issued in connection with the conversion of property from one type of residential use to another does not trigger the exemption.

The *Burien* and *NCR Properties* courts applied this principle to different types of property conversions. In *Burien*, a landlord converted its building to condominiums and "obtained a new certificate of occupancy . . . based on the change of use from apartments to condominiums." (*Burien*, *supra*, 230 Cal.App.4th at p. 1043.) A tenant, who had leased an apartment in the building in 1981 and still lived there 30 years later, received a notice that his rent would suddenly more than double. (*Id.* at pp. 1042–1043.) The landlord contended this was permissible, because the condominium conversion (and the accompanying issuance of a new certificate of occupancy) occurred after 1995, so the plain language of the section 1954.52(a)(1) exemption removed the tenant's condominium from the reach of local rent control. (*Burien*, at p. 1047.) The tenant disagreed, arguing "the exemption refers to the first certificate of occupancy issued for the unit," and did not apply to his unit because his tenancy predated the new certificate. (*Id.* at p. 1044.)

The *Burien* court concluded, "the language of [section 1954.52(a)(1)], standing alone, is susceptible of both parties' constructions, but reading the section as a whole, the exemption can only apply to certificates of occupancy that precede residential use of the unit." (*Burien*, *supra*, 230 Cal.App.4th at p. 1044.) *Burien* thus "broadly announced a rule," which the *NCR Properties* court later described as "consistent with but not apparent from the plain language of the statute" (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 48), that "section 1954.52, subdivision (a)(1), refers to certificates of occupancy issued prior to residential use of the unit." (*Burien*, at p. 1042.) In explaining its reasoning, the *Burien* court noted that a court's task when

9

interpreting a statute is "to determine the intent of the legislative body, so as to construe the statute to effectuate that purpose" (*id.* at p. 1043) and that " '[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute' " (*ibid.*).

Applying this approach (and assessing the parties' competing interpretations of the statute), the *Burien* court explained, "[w]hen a building is constructed, added on to, or altered, a certificate of occupancy is generated at the conclusion of all inspections to certify that the building meets local building code requirements for occupancy. A commonsense interpretation of section 1954.52, subdivision (a)(1), is that it excludes buildings from rent control that are certified for occupancy after February 1, 1995. Buildings that were certified for occupancy prior to February 1, 1995, are not excluded." (*Burien*, *supra*, 230 Cal.App.4th at p. 1047.) The *Burien* court found that this interpretation, proffered by the tenant there, "furthers the purpose of the exemption by encouraging construction and conversion of buildings which add to the residential housing supply," while otherwise leaving in place protection for tenants. (*Id.* at pp. 1047–1048.) By contrast, the court found, the landlord's construction "does not further the purpose of the statute. A certificate of occupancy based solely on a change in use from one type of residential housing to another does not enlarge the supply of housing." (*Ibid.*)

In *NCR Properties*, *supra*, 89 Cal.App.5th at p. 50, our colleagues in Division Three of this District considered "how broadly to read and apply" *Burien*. The landlords in *NCR Properties* purchased two single-family homes in Berkeley that had operated as unpermitted rooming houses, conducted extensive renovations to convert each home into a triplex, and obtained a certificate of occupancy for each one, reflecting the change in use from single-

10

family dwelling to multifamily use.  (*NCR Properties*, at pp. 44–45.)  The rent board determined that two of the three units in each triplex were subject to rent control (and were not covered by the § 1954.52(a)(1) exemption) because those units were developed from space that had previously been used for residential housing.  (*NCR Properties*, at pp. 45–46.)  A basement unit in one building and a third-story unit in the other building were deemed to be exempt because they were developed from previously uninhabitable space.  (*Ibid.*)

The trial court in *NCR Properties* denied the landlords' writ petitions challenging the rent board's determination (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 46), and the Court of Appeal affirmed.  The appellate court concluded the relevant legislative history supported the view that the section 1954.52(a)(1) exemption (while phrased generally as applying when a certificate of occupancy issues) was intended to apply to new construction, rather than when a certificate of occupancy accompanies the conversion of property from one type of residential use to another (such as the conversion to triplexes that occurred in the case before it).  (*NCR Properties*, at pp. 51–53.)  The *NCR Properties* court concluded:  "Consistent with this legislative understanding, and for all the compelling reasons given in *Burien*, we accordingly construe section 1954.52(a)(1) as 'refer[ring] to certificates of occupancy issued prior to residential use' of the affected property.  (*Burien*, *supra*, 230 Cal.App.4th at p. 1042.)  This is a statutory construction that 'furthers the purpose of the exemption by encouraging construction' of new buildings, as well as conversions that 'add to the residential housing supply.' (*Id.* at p. 1047.)"  (*NCR Properties*, at pp. 53–54.)

The *NCR Properties* court next addressed an argument by the landlords there that the extensive renovation of the properties at issue distinguished

11

the case from the "mere ' " 'paperwork' " ' conversion" that occurred in *Burien*. (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 54.) The *NCR Properties* court "acknowledge[d] the renovations were extensive and increased the ability of [the renovated] buildings to house tenants," but the court "conclude[d] the factual differences between this case and *Burien* do not compel a different result here." (*Ibid.*) The court stated: "To the extent Landlords contend that whenever renovations improve the condition of a rental property, those improvements take that property outside the reach of local rent control, Landlords offer no legal support for this contention. To the extent Landlords intend this line of reasoning to apply only for renovations that are sufficiently extensive, they offer no principle to distinguish such renovations from renovations insufficient to invoke the exception. Also, any interpretation of Costa-Hawkins that allows the renovation of properties in poor condition to remove them from the reach of local rent control would perversely reward landlords for allowing rental units to decay to the point the buildings need extensive rehabilitation." (*Id.* at p. 55.)

As to the landlords' related claim that the buildings were unoccupied (and that one of them was uninhabitable) prior to renovation, the *NCR Properties* court did not "consider it significant that Landlords' properties were unoccupied when renovations began. Especially with buildings near campus that house a rotating cast of students, we can hardly infer from the absence of tenants immediately before renovations began that the buildings were in fact uninhabitable." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 55.) The appellate court also expressed skepticism about whether the units were in fact uninhabitable or uninhabited. The court stated "the City's assessment that Dana Street [(one of the buildings)] could not 'be legally inhabited' appears to have been based on conditions in (or before) 2005, and

12

yet all 12 Dana Street units were reportedly occupied between 2006 and 2008. And even if we were to conclude that Costa-Hawkins intended to reward Landlords for remedying the conditions that made the third floor of Dana Street an uninhabitable fire hazard by removing that portion of the building from rent control, well, the Rent Board has already taken this step." (*Ibid.*)

After considering the landlords' remaining arguments, the *NCR Properties* court concluded the holding in *Burien*—that the section 1954.52(a)(1) exemption applies when a certificate of occupancy *precedes* residential use of a dwelling or unit—should apply in what the *NCR Properties* court acknowledged was a somewhat different factual situation from the one addressed in *Burien*. (*NCR Properties*, *supra*, 89 Cal.App.5th at pp. 56, 44, 50.) "In sum," the *NCR Properties* court stated, "we see no reason to abandon the statutory construction of Costa-Hawkins's first exemption that was adopted in *Burien*, and we agree with the Rent Board that, applying that construction here, only one of three units in each of Landlords' buildings is exempt from local rent control." (*Id.* at p. 56.)[7]

---

[7] In addition to *Burien* and *NCR Properties*, the City relies in this appeal (as it did in the trial court) on *Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24 (*Da Vinci Group*). As the *NCR Properties* court noted, *Da Vinci Group* "predates Costa-Hawkins and construes an ordinance not at issue in this case, and the case is accordingly of limited use here." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 50.) But *Da Vinci Group* is consistent with the conclusion reached in *NCR Properties*. In *Da Vinci Group*, a warehouse had been informally converted into apartments by 1980 and several years later, following substantial renovations to bring the residential units up to code, was awarded its first certificate of occupancy. (*Da Vinci Group, supra,* 5 Cal.App.4th at p. 27.) Construing a " 'new construction' " exemption in the local rent control ordinance, the appellate court in *Da Vinci Group* upheld the local agency's determination that this

**C.** *Applicability of the Section 1954.52(a)(1) Exemption to Admirals Cove*

We find the *Burien* and *NCR Properties* courts' analysis persuasive, and we adopt their interpretation of section 1954.52(a)(1) as " 'refer[ring] to certificates of occupancy issued prior to residential use' of the affected property." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 54, quoting *Burien*, *supra*, 230 Cal.App.4th at p. 1042.) A certificate of occupancy that is issued after February 1, 1995, does not trigger the section 1954.52(a)(1) exemption if there was prior residential use of the property. We agree this statutory construction " 'furthers the purpose of the exemption by encouraging construction' of new buildings, as well as conversions that 'add to the residential housing supply.' " (*NCR Properties*, at p. 54, quoting *Burien*, at p. 1047.)

Applying this construction here, section 1954.52(a)(1) does not exempt the Admirals Cove project from local rent control. Although the certificate of occupancy for the Admirals Cove townhomes was issued in 2020 after their renovation (and described the occupancy as "new"), the buildings were previously used as residential housing. Over the course of decades, they provided living accommodations for military personnel and their families. For purposes of the exemption at issue here, the rehabilitation of these residential units, although extensive, did not create new housing.

As noted, the trial court reached a different conclusion, finding that, "[g]iven the language of the statute and its application to the redeveloped

---

exclusion did not apply, although "[a]t first glance" it appeared to, because the belatedly obtained certificate of occupancy merely legalized residential use that was already occurring. (*Id.* at pp. 28–30.) The certificate of occupancy was new, but the "units were not newly constructed, nor was the building restructured to permit new residential use," the *Da Vinci Group* court explained. (*Id.* at p. 30.)

navy housing at issue," Admirals Cove is exempt from local rent control pursuant to section 1954.52(a)(1). We are not persuaded that the considerations highlighted by the trial court (or by Carmel in its appellate brief urging affirmance) support the application of the section 1954.52(a)(1) exemption here.

The trial court initially noted (and Carmel reiterates in its appellate brief) that the "plain language" of section 1954.52(a)(1) suggests the only prerequisite for finding a property exempt from local rent control is the issuance of a certificate of occupancy after February 1, 1995. The trial court also recognized, however, that "case law informs the reading of the statute," and that *Burien* and *NCR Properties* have interpreted the statute as referring to certificates of occupancy issued *prior to* residential use of the property. And the trial court acknowledged the appellate courts' conclusion that this construction " 'furthers the purpose of the exemption by encouraging construction' of new buildings, as well as conversions that 'add to the residential housing supply.' " (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 54, quoting *Burien*, *supra*, 230 Cal.App.4th at p. 1047.) But the court found that applying the exemption in this case *would* further the purpose of the exemption because, in light of such factors as the nature of the property's prior use (as military housing) and the extent of Carmel's redevelopment of the property, the Admirals Cove project "effectively qualifies as new residential housing stock."

We disagree. First, as to the statute's "plain language" referring only to a certificate of occupancy issued after February 1, 1995, the trial court correctly recognized (and Carmel also acknowledges) that, under *Burien* and *NCR Properties*, that language is not dispositive. As the *Burien* and *NCR Properties* courts explained, a construction of section 1954.52(a)(1) that

15

considered only its literal language (and thus exempted property that might only be changing from one residential use to another) would not further the statutory purpose to enlarge the supply of housing. (*Burien*, *supra*, 230 Cal.App.4th at p. 1047; *NCR Properties*, *supra*, 89 Cal.App.5th at pp. 50, 48.) Instead, as the *NCR Properties* court stated, "*Burien* broadly announced a rule, consistent with but not apparent from the plain language of the statute, that 'section 1954.52, subdivision (a)(1), refers to certificates of occupancy issued prior to residential use of the unit.' " (*NCR Properties*, at p. 48.) As noted, we agree with this interpretation of the statute.

Second, we are not persuaded that the extent of the renovations conducted by Carmel or the period of vacancy that preceded them provides a basis to apply the exemption here. As noted, the *NCR Properties* court rejected a similar argument by the landlords there, stating first that there was no basis to exempt a property from local rent control "whenever renovations improve the condition of a rental property" (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 55), and that, to the extent the exemption was urged for "renovations that are sufficiently extensive" (*id.* at p. 55), the landlords offered "no principle to distinguish such renovations from renovations insufficient to invoke the exception" (*ibid.*).

Recognizing that the period of vacancy on this record is much longer than the brief vacancy period attributed to transitory student turnover in *NCR Properties* (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 55)—which, in that respect at least, makes this a harder case—we nonetheless reach the same conclusion. It is clear the renovation of the Admirals Cove townhomes was extensive, involving significant work on the buildings' interiors and exteriors, as well as upgrades to the surrounding infrastructure. And while there was some uncertainty in *NCR Properties* as to whether the properties

16

were in fact uninhabitable prior to their renovation (*ibid.*), the parties here agree the townhomes were not suitable for occupancy upon their transfer from the Navy. But like the *NCR Properties* court, we decline to adopt an approach that seeks to determine in each case whether the particular renovations at issue are extensive enough to remove a property from local rent control.

We have concluded, consistent with the bottom-line holdings in both *Burien* and *NCR Properties*, that the section 1954.52(a)(1) exemption applies only when a certificate of occupancy *precedes* residential use. The opposite is true here—the residential use of the Admirals Cove townhomes preceded the 2020 issuance of the certificate of occupancy—so the exemption from local rent control does not apply. We decline Carmel's invitation to take a more fact-intensive approach to the exemption, since that mode of analysis involves case-by-case inquiry into whether a building that *has* been put to residential use should nevertheless be exempted from local rent control because subsequent renovations are deemed sufficiently extensive to qualify the structure as "new housing," or because no one lived there for a few days, a few months, or even many years. Because housing investment decisions often ride on certainty in advance, a bright-line approach to the analysis is preferable.[8]

---

[8] We are not persuaded by Carmel's suggestion (which it makes in the midst of an argument on another point) that provisions of the Revenue and Taxation Code governing property taxation of rehabilitated buildings should be applied here. (See Rev. & Tax. Code, § 70, subds. (a)–(b).) For the reasons discussed in the text and in *NCR Properties*, we conclude the correct standard in the rent control exemption context under Costa-Hawkins is whether there was prior residential use of the property, not whether renovations might in some other context be regarded as extensive enough to constitute new construction.

17

The trial court and Carmel seek to distinguish one aspect of the *NCR Properties* court's reasoning by noting that Carmel was not responsible for the decay of the Admirals Cove townhomes during the period when they were owned by the military. But *NCR Properties* did not hold that a landlord's fault in allowing a property to deteriorate was a factual issue to be considered case-by-case in determining the applicability of the section 1954.52(a)(1) exemption. Instead, *NCR Properties* mentioned this point as a reason supporting its decision as to the proper legal interpretation of the statute— the court noted that "any interpretation of Costa-Hawkins that allows the renovation of properties in poor condition to remove them from the reach of local rent control would perversely reward landlords for allowing rental units to decay to the point the buildings need extensive rehabilitation. We see no indication the Legislature intended that result here." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 55.)

We agree with this analysis, and we do not read it as a statement that a renovated residential property becomes exempt from local rent control if it can be said, as a factual matter, that the property's deterioration was the fault of a prior owner rather than of the current owner that conducted the renovations. To the contrary, in the *NCR Properties* case itself, the court noted the residential properties at issue were already "derelict" when they were purchased and renovated by the new owners. (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 43.) That was not a reason to apply the exemption in *NCR Properties*, and we do not see it as a reason to apply the exemption here.

The trial court and Carmel also suggest the use of Admirals Cove for military housing should not be considered a prior "residential use" of the property for purposes of applying the exemption from local rent control. The trial court and Carmel note that, when the property was owned by the

18

military, it could not be regulated by state or local government. (See § 755 ["Real property within the State is governed by the law of this State, except where the title is in the United States."].) Carmel further urges that prior "residential use" in this context should be understood as "standard, plain-vanilla rental use as an apartment or private home," "available to the general public," and that "military use" is "qualitatively different" from what *Burien* and *NCR Properties* meant when referring to a property's prior "residential use."

The argument does not persuade. We note initially that, as a factual matter, it is undisputed that the Navy and then the Coast Guard used the buildings in question as living accommodations (i.e., as residences) for enlisted personnel and their families, rather than for some type of non-housing use. We also agree with the trial court's statement at the hearing on Carmel's motion for judgment that the military housing in this case does not present an "extreme" prior use of the property such as the prison example proffered by Carmel. And while the trial court viewed the military housing units as being "generally outside of local control," the court acknowledged "[t]he housing helped supplement local housing stock, allowing navy and coast guard personnel to live close to the base without occupying private units in the community . . . ."

Moreover, the fact the residential units at Admirals Cove were only available to enlisted military personnel and their families, and not to the general public, does not convince us that those units should be treated differently from other residential housing for purposes of applying the exemption from local rent control. The parties stipulated that there are various types of "residential rental properties in the City of Alameda that are not available to all members of the public," including senior housing projects

19

where residents must be of a certain age, as well as numerous projects where tenancy is restricted to households of certain incomes. Some units are available only to persons with disabilities, veterans, or formerly unhoused persons. Finally, preferences are in some instances "offered to those who live or work in Alameda or who are employees of the Alameda Unified School District." Like the Alameda residents who are eligible to live in these housing projects or units based on their status, the military personnel who were stationed in Alameda were for that time period members of the community whose military status made them eligible to live in the Admirals Cove housing.

The trial court found the "examples of other types of restricted housing" (i.e., housing available only to certain persons, such as seniors or persons with specified income levels) were distinguishable from the military housing at Admirals Cove, because "[s]uch units are still part of the City's residential housing market, despite their special characteristics." We do not agree the Admirals Cove military housing can be distinguished from other residential housing on this basis. As noted, the Admirals Cove housing units were part of the City's overall supply of residential housing, providing residences for some community members who were eligible based on their military status. The 2020 certificate of occupancy that followed Carmel's renovation of the units was not a " 'certificate[] of occupancy issued prior to residential use' of the affected property." (*NCR Properties*, *supra*, 89 Cal.App.5th at p. 54, quoting *Burien*, *supra*, 230 Cal.App.4th at p. 1042.) The section 1954.52(a)(1) exemption from local rent control therefore does not apply.[9]

---

[9] As discussed, we have reached this conclusion by applying the *Burien* and *NCR Properties* courts' interpretation of the exemption to the factual setting presented here, and by reviewing de novo the conclusions reached by

20

Finally, Carmel suggests other factors (not relied on by the trial court) support application of the exemption from local rent control. Specifically, Carmel asserts the City and other public entities have made statements or taken actions reflecting a view that the Admirals Cove project increased the City's housing supply or amounted to new construction.[10] The City disputes Carmel's characterization of some of these matters, and argues that, in any event, there is no basis to estop the City from enforcing an important public priority such as rent control. Carmel responds that it does not argue estoppel applies here, but it asserts the alleged statements show the correctness of its position as to the applicability of local rent control to Admirals Cove.

We need not delve into the parties' arguments on these points, as they are not relevant to the legal issue presented in this appeal. As discussed, we agree with the interpretation of section 1954.52(a)(1) adopted by the *Burien* and *NCR Properties* courts, and we conclude on de novo review that when that interpretation is applied here, the Admirals Cove project is not exempt from local rent control, because the certificate of occupancy for the project

---

the trial court and the administrative hearing officer. We have not determined the exemption's applicability by deferring to the interpretation of state law (§ 1954.52(a)(1)) set forth in the regulation issued by the City's Rent Program Director (Reg. 23-02). We therefore need not address the parties' arguments as to whether deference is appropriate here.

[10] Carmel argues (1) the City treated the project as new housing when reporting its progress toward meeting the City's regional housing needs allocation under state law (Gov. Code, § 65580 et seq.); (2) the City treated other former military housing at Naval Air Station Alameda as not having been subject to rent control; (3) the City and the East Bay Municipal Utility District (EBMUD) considered the Admirals Cove project to be new construction when assessing certain development impact fees (with Carmel arguing at that time that the project was *not* new construction); and (4) the County of Alameda has treated the project as new construction for purposes of property taxation.

was not issued prior to residential use of the property.  That the City or other entities may have expressed views about the nature of the development in other contexts does not alter our conclusion on this point.

### III. DISPOSITION

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.  The City shall recover its costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

GOLDMAN, J.
CLAY, J.[*]

---

[*] Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:        Superior Court of California, County of Alameda

Trial Judge:        Hon. Michael M. Markman

Counsel:            Yibin Shen, City Attorney, Michael H. Roush; Meyers
                    Nave, Margaret M. Sohagi, R. Tyson Sohagi and Mark J.G.
                    Desrosiers for Defendants and Appellants.

                    Matthew Brown and Oliver Ehlinger for Berkeley Rent
                    Stabilization Board as Amicus Curiae on behalf of
                    Defendants and Appellants.

                    Alison G. Regan for Santa Monica Rent Control Board as
                    Amicus Curiae on behalf of Defendants and Appellants.

                    Nielsen Merksamer, Christopher E. Skinnell and James W.
                    Carson for Plaintiff and Respondent.

*CP VI Admirals Cove, LLC v. City of Alameda et al.* - A170689, A170986